**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **RICHARD COLE, BRADFORD COLE,** | ) | |
| **CARY JUSTICE, MICHAEL MASSEY,** | ) | |
| **and DON WEGENER,** | ) | |
| | ) | |
| | ) | **Case No. _____** |
| **Plaintiffs, on behalf of themselves** | ) | |
| **and all others similarly situated,** | ) | |
| | ) | |
| **v.** | ) | **JURY DEMANDED** |
| | ) | |
| **AMERICAN SPECIALTY HEALTH** | ) | |
| **NETWORK, INC.; AMERICAN SPECIALTY** | ) | |
| **HEALTH, INC. ; CIGNA CORPORATION,** | ) | |
| **INC,; JOHN DOES A, B, & C;** | ) | |
| **and JANE DOES A, B, & C,** | ) | |
| | ) | |
| **Defendants.** | ) | |

_____

**COMPLAINT**
_____

COME NOW the Plaintiffs, Richard Cole, Bradford Cole, Cary Justice, Michael Massey, and

Don Wegener, on behalf of themselves, and all others similarly situated, by and through their

attorneys, and for this their Complaint against the Defendants, state as follows:

## I.  PARTIES AND JURISDICTION

1.      Richard Cole is a doctor of chiropractic.  His practice residence is Cole Pain Therapy Group, 3845 Summer Oaks, Memphis, TN 38134.

2.      Bradford Cole is a doctor of chiropractic.  His practice residence is Cole Pain Therapy Group, 3845 Summer Oaks, Memphis, TN 38134.

3.      Cary Justice is a doctor of chiropractic.  His practice residence is Justice Chiropractic, 1615 Gallatin Rd North, Suite A, Madison, TN 37115.

4.      Michael Massey is a doctor of chiropractic.  His practice residence is Massey Chiropractic, 740 Tell Street, Suite 400, Athens, TN 37303.

5.      Don Wegener is a doctor of chiropractic.  His practice residence is Powell Chiropractic, 7311 Clinton Highway, Powell, TN 37849.

6.      CIGNA Corporation (hereinafter "CIGNA") is an insurance company headquartered in Bloomfield Connecticut, and registered to conduct insurance business in the State of Tennessee.  The foreign registered name in the State of Tennessee and its website lists CIGNA Corporation's corporate addresses as 900 Cottage Grove Road, Bloomfield, CT 06002 and 1601 Chestnut Street TL 160, Two Liberty Place, Philadelphia, PA 19192-0001 as their principal places of business.

7.      American Specialty Health Networks, Inc. and/or American Specialty Health, Inc. (hereinafter "ASH") is a utilization management company headquartered at and with its principal place of business at 10221 Waterridge Circle, San Diego, California, 92121. It has been doing business in Tennessee since May of 2011.

2

8.    John Does A, B, and C and Jane Does A, B, and C are real but, as yet, unidentified persons who have acted in concert with the named Defendants to carry out the wrongful conduct complained of herein.

9.    All or part of the wrongful conduct and/or transactions described herein have impacted interstate commerce.

10.   All or part of the wrongful conduct and/or transactions described herein originated in the State of Tennessee, and in this District, where CIGNA maintains an office located at 3100 West End Ave. #1000, Nashville, TN, 37203, and where this entity transacts business with ASH, Plaintiffs and those similarly situated, and where CIGNA, through ASH, causes claims to be reviewed, causes providers of services, including Plaintiffs and those similarly situated, to be subject to the claims process, and in this District, where Tennessee chiropractic physicians reside and where the contract was executed, and where, in part, the conduct arose.

11.   Jurisdiction is proper in this Court pursuant to 28 USC §§ 1331 and 1332(a), 28 USC §1332(d), 28 USC §1367 and 18 USC §1964(c). All parties are subject to the jurisdiction of this Court.

12.   Since certain Defendants have business offices in this District, business has been transacted in this State, and wrongful acts occurred in this District, venue is proper in this District under 28 U.S.C. § 1391 and 18 USC §1965(a).

## II. FACTUAL ALLEGATIONS

## A. THE RELATIONSHIP OF THE PARTIES

13.     The allegations of Paragraphs 1-12 hereinabove are reiterated and incorporated as if fully set forth herein.

14.     Plaintiffs bring this action on behalf of themselves and those similarly situated.

15.     Plaintiffs are practicing doctors of chiropractic medicine that have been in practice in the State of Tennessee for a number of years.

16.     Plaintiffs are licensed in the State of Tennessee to practice chiropractic medicine and provide treatment to patients and residents of the State of Tennessee.

17.     CIGNA is a health insurance company that contracts with employers and organizations worldwide to develop programs, insurance services and provide medical health insurance coverage.  It provides health care and related benefits offered to individuals, and through employers, brokers and consultants, including health care products and services, group disability, life and accident insurance, and international insurance coverage.

18.     CIGNA was formed in 1982 through the combination of INA Corporation and Connecticut General Corporation.

19.     CIGNA provides health insurance coverage to individuals for health related services, including chiropractic services.

20.     In-network providers are approved by CIGNA through a credentialing process and are provided with certain benefits, including higher reimbursement rates, than out-of-network

4

providers. An in-network provider has met certain qualifications of CIGNA and is paid a certain amount for treating a patient who holds a policy of insurance with CIGNA through their employer or privately.

21. An out-of-network provider for CIGNA has not met the qualifications required by CIGNA and is not a party to a contract with CIGNA, and does not receive in-network provider benefits.

22. An out-of-network provider receives a copay and/or part of a deductible from treatment of a patient who holds a policy of insurance with CIGNA, and may receive additional monies from CIGNA, at typically a lower rate than an in-network provider.

23. At all times relevant herein, Plaintiffs had been approved as in-network providers for CIGNA and had treated CIGNA patients.

24. Plaintiffs and other in-network providers for CIGNA, after treating a patient that was covered by CIGNA health insurance, received a co-pay amount from the patient and an additional amount from CIGNA at a rate paid to in-network providers.

25. This rate was determined by the contract that existed between CIGNA and Plaintiffs and those similarly situated, and also by a fee schedule provided by CIGNA.

26. In-network providers for CIGNA, for chiropractic services, were typically paid more than a provider that was classified as out-of-network.

27. ASH, a company headquartered in San Diego, CA, provides health plans, employer groups, insurance carriers, and trust funds with a wide range of population health management,

5

fitness and exercise, and specialty health care management programs to improve the health of their members of employees.

28. ASH was founded as a chiropractic network and management company in Southern California in 1987 in a two bedroom condominium.

29. At a time and date unknown to Plaintiffs, CIGNA and ASH entered into an agreement whereby ASH would undertake to perform the claims payment, utilization review and network management of chiropractic services for CIGNA.

30. ASH holds itself out as the administrator for CIGNA chiropractic services.

31. Plaintiffs and those similarly situated, at various times in 2010, began to receive letters advising them that CIGNA would be entering into an agreement with ASH.

32. Matthew T. Ungs, Vice President, Contracting and Provider Services, CIGNA sent written correspondence to Plaintiffs and those similarly situated, advising that CIGNA had contracted with ASH to manage and administer in-network chiropractic benefits for CIGNA benefit plans, and that in order to remain as an in-network provider with CIGNA, Plaintiffs and those similarly situated would be required to contract with ASH and enroll with ASH by a certain deadline, or Plaintiffs and those similarly situated would lose their in-network status and be considered out-of-network with CIGNA.

33. John Donoghue, Vice President, Network Management, ASH sent written correspondence to Plaintiffs and those similarly situated, advising that CIGNA had contracted with ASH to manage and administer in-network chiropractic benefits for CIGNA benefit plans, and that

6

in order to remain as an in-network provider with CIGNA, Plaintiffs and those similarly situated would be required to contract with ASH and enroll with ASH by a certain deadline, or Plaintiffs and those similarly situated would lose their in-network status and be considered out-of-network with CIGNA.

34. Plaintiffs and those similarly situated were advised that their existing CIGNA agreement, while remaining in effect, would be "suspended" as it pertained to CIGNA managed care medical benefit plans for chiropractic services and would remain "suspended" as long as the CIGNA contract with ASH Networks was in effect.

35. Plaintiffs and those similarly situated were advised that they <u>must</u> participate with the ASH network to continue providing in-network services to individuals covered under CIGNA administered plans.

36. Upon information and belief, patients of Plaintiffs who were covered by CIGNA benefits were not told of this change in status.

37. Plaintiffs and those similarly situated had not previously contracted with ASH, but they were required to sign an "Election to Participate with CIGNA," document which contained language that included the following:

    a.    "You acknowledge that you wish to become a "Represented Provider" of American Specialty Health Networks, Inc. "("MCA") pursuant to its participation agreement with CIGNA, for so long as the MCA Agreement is in effect."

    b.    "You will provide to Participants Covered Services that are within the scope of your

7

health care practice, and pursuant to the applicable terms and conditions of the MCA Agreement and this Election."

c.    "You will accept as full payment due from CIGNA or other Payor for rendering such Covered Services the amounts specified and payable by MCA."

d.    "You agree to cooperate with, and abide by, CIGNA's programs, procedures, and policies, including but not limited to those regarding billing, provider credentialing, utilization management, quality assurance, medical record keeping and Participant grievances and appeals."

e.    "If you currently have a direct agreement with CIGNA under which you render Covered Services to Participants under those CIGNA managed care programs that are the subject of the MCA agreement, then, notwithstanding any provision to the contrary, the undersigned health care provider's rights and obligations under any Direct Agreement with respect to Participants under said Programs shall be suspended from the date on which he or she is or becomes a party to such arrangement with MCA...If applicable, during such suspension, the terms of your participation in those programs, including but not limited to the terms relating to reimbursement, shall be governed instead by Your arrangement with MCA."

38.    Plaintiffs and those similarly situated were not allowed to negotiate with CIGNA or ASH regarding the "suspension" of the CIGNA contract or the conditions of the ASH relationship.

8

39. Plaintiffs and those similarly situated were required to sign the Election to Participate with CIGNA, as written, in order to maintain in-network provider status.

40. Plaintiffs and those similarly situated were advised by CIGNA that ASH had been hired to perform utilization management on claims, network contract administration, network management, and claims processing and payment.

41. Plaintiffs were not given an opportunity to negotiate terms with ASH or CIGNA.

42. Plaintiffs and those similarly situated were sent an enrollment packet to complete in order to enroll with ASH and remain as in-network provider with CIGNA.

43. Plaintiffs and those similarly situated, were not made aware that there was an additional 82 page contract, in addition to the enrollment packet, which was not provided to them at the time that the enrollment paperwork was to be completed. Instead, Plaintiffs and others executed what was represented to them to be the contract.

44. It was only after Plaintiffs and those similarly situated had executed the Election to Participate with CIGNA agreement and enrollment paperwork for ASH, that they were sent a CD containing an 82 page contract, with terms, conditions, requirements, fee schedules, and restrictions to which they were required to adhere as part of their new contract with utilization management company ASH.[1] Plaintiffs and those similarly situated were provided with no prior knowledge of an 82 page contract or CD of terms and conditions, but

---

[1]Out of an abundance of caution, all contracts and/or documents referenced herein will be attached and/or filed with the Court once a protective order is in place, as these contracts are confidential, contain within them terms that forbid Plaintiffs from disclosing without written permission, and are likely considered by CIGNA/ASH to be proprietary documents.

instead were advised that the Election to Participate with CIGNA agreement was the entire agreement.

45.     Plaintiffs and those similarly situated were unable to receive any assistance from CIGNA during this process, despite numerous questions relating to the addition of a utilization review company by CIGNA.

46.     The new terms contained within the ASH contract required Plaintiffs and those similarly situated to submit additional documents in order for ASH, to determine whether or not treatment recommended for patients by Plaintiffs and those similarly situated was medically necessary.

47.     The new terms, contained within the ASH contract, required Plaintiffs and those similarly situated to undergo a claims review process by ASH-hired chiropractic physicians, who would review the records of patients treated by Plaintiffs and those similarly situated, and then decide whether or not to deny the claims based upon the medical necessity of the treatment. The medical judgment of the provider ordering and administering treatment, and then submitting the claim for payment, had no bearing on the review for medical necessity.

48.     The new terms contained within the ASH contract required Plaintiffs and those similarly situated to comply with a tier system, created by ASH.  Under the tier system, providers who routinely submitted less than x number of claims on average for each patient, for example, 5 claims or less for each patient, would be subject to less scrutiny in review and required to submit less paperwork than a provider who routinely submitted more than 5, for example, 15, claims on average for each patient.  The higher the average number of claims, the more

10

paperwork the chiropractic physician was required to submit. A similar program existed for xray averages for providers centered around the number of xrays performed vs. the average sought by ASH.

49. ASH marketed its tier system to providers as a benefit. In one written correspondence attempting to recruit Tennessee chiropractic physicians, ASH represented that out-of-network providers with CIGNA were still subject to utilization review by ASH (despite the absence of a contract with the out-of-network provider), and that an out-of-network provider's patients would only receive five visits before the provider was subjected to a medical necessity review requiring the provider to show why more than five visits were medically necessary pursuant to ASH standards.

50. Upon information and belief, ASH is not licensed to do business in the State of Tennessee, and its peer review chiropractic physicians that have reviewed the clinical treatment of Plaintiffs and others similarly situated are from many different states, not including Tennessee.

51. Not all CIGNA benefit plans were subjected to ASH utilization review. Some employers who purchased benefit plans for company employees "opted out" of ASH utilization review, and paid additional benefits in order to "opt out" of ASH utilization review. However, providers were not made aware of this option, but instead they were advised that they "must" enroll with ASH in order to sustain the in-network status with CIGNA.

52. Of the benefit plans subjected to ASH utilization review, patients and employers were not made aware of the contract between CIGNA and ASH. ASH did not speak directly to

patients, only providers, and CIGNA continued to send out Explanation of Benefit forms to its participants as if it were paying claims. Providers, however, would receive forms from ASH reflecting the breakdown of billed, allowed, paid, and patient owed amounts after treatment was rendered.

## B. CONDUCT AND ACTIVITIES OF ASH/CIGNA

53. The allegations of Paragraphs 1-52 hereinabove are reiterated and incorporated as if fully set forth herein.

### 1. Explanation of Benefits mailings

54. At all times pertinent herein, after a patient receives services from a chiropractic physician, an Explanation of Benefits (EOB") form is generated and mailed to the patient breaking down the billed amount, the discount amount due to the insurance coverage, the amount already paid by the patient and how much, if anything, is owed by the patient.

55. At all times pertinent herein, after a patient receives services from a chiropractic physician, a similar form to the EOB form is sent to the chiropractic physician breaking down the billed amount, the discount amount due to the insurance coverage, the amount already paid by the patient and how much, if anything, is owed by the patient.

56. At all times pertinent herein, when EOB statements are mailed after a claim is filed, statements are sent to the patient and chiropractic physician, but from two different companies. CIGNA patients receive a CIGNA EOB; chiropractic physicians receive an ASH EOB.

12

57.     At all times pertinent herein, the two sets of EOBs, when compared, are different, including different discounts, amounts paid, and amounts owed by the patient.

58.     Upon information and belief, the patient is not informed of the existence of ASHN as the third party company reviewing the treatment, but instead the patient is told that CIGNA is the benefits provider and the company covering treatment.

59.     At all times pertinent herein, the chiropractic physician receives an ASH EOB with different amounts than the CIGNA EOB, including the amount owed by the patient to the provider.

60.     At all times pertinent herein, this procedure causes confusion and errors in billing, as the patient is billed by the chiropractic office for an amount alleged to be owed by the patient that is not reflected on the patient forms.  It also causes confusion and errors in billing, as the misrepresentations in the forms are inconsistent with the terms of coverage provided to the patient by CIGNA and represented to the patient to be paid to the provider after treatment and services are rendered.

61.     The inconsistent and erroneous billing between CIGNA and ASH causes the provider to lose monies, and causes the patient to owe monies inconsistent with the benefits contracted for on behalf of the patient.

62.     At all times pertinent herein, CIGNA/ASHN, through these erroneous billing representations, misapply the amount of copays, patient responsibility, and outstanding amounts due, resulting in a shifting of fees.

        **2.      Claims processing is not completed at all, and/or not completely timely, and/or**

**completely incorrectly.**

63.    At all times pertinent herein, chiropractic physicians have been forced to use the claims processing system provided by ASH pursuant to the MCA agreement signed by chiropractic physicians in order to maintain in-network status with CIGNA.

64.    At all times pertinent herein, these claims processing tools include online, mail, and telephone services provided by ASH.

65.    Chiropractic physicians, despite having an existing, although "suspended" contract with CIGNA, and despite maintaining in-network status with CIGNA, are not allowed to contact CIGNA with claims processing questions.

66.    As a result of this, chiropractic physicians are forced to use the claims processing management system provided by ASH in order to have claims paid as in-network providers of CIGNA patients.

67.    Even though certain claims are not subject to ASH review, due to the "opt out" by the employer, CIGNA refuses to process the claims directly, causing the provider to remain unpaid, despite having rendered services as contracted.

68.    For example, when a claim is sent to ASHN for processing by the chiropractic physician, including Plaintiffs and those similarly situated, ASHN will not process the claim because ASHN is not the third party review company for certain employers.  The claim is then sent back to the provider, unprocessed and rejected.  The chiropractic physician then submits the claim to CIGNA.  CIGNA sends the claim back unprocessed and rejected, because all

14

chiropractic claims are to be processed through ASHN.  The claim remains unpaid.

69.     When attempting to have the claims paid, by calling and utilizing the tools provided by ASH, the Plaintiffs and others similarly situated are provided with conflicting and inaccurate information.

70.     As a direct and proximate result, the unpaid claim is never processed and the provider remains unpaid.

71.     As of the filing of this complaint, Plaintiffs and those similarly situated report outstanding claims as far back as May 2011.

72.     Alternatively, claims may be processed, but chiropractic physicians are paid incorrect amounts, using the ASHN fee schedules instead of CIGNA fee schedules when the employer/company contracted with CIGNA has specifically "opted out" of any dealings with ASHN review. This improper payment results in damages to the Plaintiffs and those similarly situated.

**3.      CIGNA and ASH misrepresent the benefits for patients.**

73.     At all times pertinent herein, patients covered by CIGNA insurance plans have purchased health insurance coverage.

74.     Those patients have contracted with CIGNA, not ASH, to receive certain benefits, for example, a certain number of visits to chiropractic physicians annually.

75.     Some plans, including the State of Tennessee CIGNA plan, provide benefits to the patient

15

as follows: visits #1-#20 are paid by $25 copay, and visits #21 and up are paid by a $40 copay for in-network chiropractic physician providers. Out-of-network providers are paid a $45 copay for visits 1-20 and $65 copay for visits after 21 by the patient.

76.    It is represented to the patient and the chiropractic physician that the patient can receive treatment from a chiropractic physician when medically necessary on these terms, for unlimited visits, raising the amount of the copay for the patient depending on the number of visits.

77.    The patients and employers pay a contracted amount of money to CIGNA for these options and contract with CIGNA to provide these benefits. There is no contract between the patients and employers and ASH.

78.    After treatment is rendered, the chiropractic physician is required to submit the claim to ASH for claims processing as part of the contract between ASH and CIGNA. ASH, as a third party review company, reviews the treatment provided by the chiropractic physician.

79.    Based on ASH criteria, ASH fee schedules, and ASH payment conditions, the number of visits available annually to patients are more limited than the CIGNA policy represents.

80.    ASH represents to providers, including Plaintiffs and those similarly situated, that a patient may receive treatment for up to five visits. After five visits, the claims are subject to denial if the chiropractic physician does not meet standards set by ASH for medical necessity. After five visits, the claims are subject to approval only if additional paperwork is completed by the chiropractic physician and the patient. After five visits, the claims are subject to

16

denial if the ASH reviewer, a chiropractic physician in California, does not believe that the treatment was medically necessary and/or lacking in some way.

81.     Despite the representations made to patients and providers by CIGNA as to the coverage available, ASH may alter the amount of copay that the patient is responsible for, and may also alter the deductible, applying some of the claim to a patient's deductible in violation of the contract between the patient and CIGNA, relying instead on the terms and conditions contained within the contract between ASH and CIGNA.

82.     If the chiropractic physician obtains additional approval in excess of five visits in order to treat the patient and be paid for the treatment, the chiropractic physician, including Plaintiffs and those similarly situated, is faced with a penalty from ASHN for submitting too great a number of claims.  The provider is classified in a certain "tier" system – the higher the tier that the chiropractic physician is placed in, the more paperwork that is required to demonstrate the need for treatment as to all CIGNA patients, prior to the exhaustion of five visits.

83.     The additional requirements are not contained in the representations made by CIGNA.

84.     As a result, patients are denied the care that they have purchased through the CIGNA plan, and providers are denied payment for care rendered to patients in need of medical care.

85.     Patients at no time have contracted with ASHN, and most know nothing of ASHN or the review mechanisms.

86.     As a direct and proximate result, ASH interferes with the provider's medical judgment and

17

determination, and ultimately, what is determined to be medically necessary is undermined by the ability of a third party review company to control the claims that will and will not be paid pursuant to ASH terms and conditions.

87. This activity directly interferes and infringes on the doctor/patient relationship and places the patient at risk of being denied treatment that is medically necessary and requested by the patient, and the provider at risk of not providing treatment within the standard of care required.

**4.** **Plaintiffs and those similarly situated are provided inaccurate information by ASH and CIGNA representatives, resulting in penalties to providers, loss of incentives, misrepresentations to patients, and the assessment of additional fees.**

88. ASH requires certain mechanisms to be used when Plaintiffs and others similarly situated submit claims. ASH also provides customer service representatives to answer questions posed by Plaintiffs and those similarly situated.

89. Plaintiffs, and those similarly situated, have received confusing, incorrect and inconsistent information from customer service representatives and agents of ASH.

90. As a direct and proximate result of this incorrect information provided to Plaintiffs and those similarly situated, claims processing is delayed and claims are denied.

91. ASH also assesses a penalty against Plaintiffs and those similarly situated for the submission of erroneous or improper claims. As a direct and proximate result of the incorrect information provided to Plaintiffs and others similarly situated, Plaintiffs and those similarly

18

situated have been penalized and have lost monetary "credits".

92.    ASH and CIGNA are often called by Plaintiffs and those similarly situated to obtain benefits information for patients prior to treatment being rendered. Most often, Plaintiffs and those similarly situated are contacting ASH and/or CIGNA to obtain copayment and visit information. Once this information is obtained, it is immediately passed on to the patient so that the patient has knowledge of the cost of the treatment proposed.

93.    However, ASH and/or CIGNA provide inaccurate information about patient benefits and copay/deductible amounts, resulting in a misrepresentation by the provider to the patient, relying on ASH and/or CIGNA. It is only after the claim has been submitted and the patient receives an explanation of benefits, and the provider receives documentation from ASH, that the numerical differences are made known to the provider and to the patient. Absent this, the provider and patient proceed with treatment based on the representations made by ASH and/or CIGNA obtained prior to treatment.

94.    ASH also penalizes Plaintiffs and those similarly situated for the submission of paper claims instead of electronic claims. When a provider submits an electronic claim, the individual receives a monetary "credit" per claim.

95.    Plaintiffs and those similarly situated are then penalized for that monetary "credit" if a paper claim is submitted.

96.    ASH also charges Plaintiffs and those similarly situated for each paper check sent for payment. A $3.00 fee is charged to Plaintiffs and those similarly situated who require a

19

paper check to be sent as opposed to using ASHN's electronic enrollment process.

97. However, ASH requires that, if a claim is submitted and denied by ASHN, the claim must be resubmitted by Plaintiffs and those similarly situated with supporting documentation only via paper claim.

98. These unfair terms and conditions result in penalties to Plaintiffs and those similarly situated, who are required to follow the policies of ASH in order to have claims submitted.

**5.  Claims are not paid pursuant to contractual terms for in and out-of-network physicians, including Plaintiffs and those similarly situated.**

100. At all times pertinent herein, Plaintiffs and those similarly situated have experienced inconsistent payments in violation of contracted amounts both as "in-network" providers and "out-of-network" providers for ASH/CIGNA.

101. Specifically, when Plaintiffs and those similarly situated Plaintiffs and those similarly situated were classified as "in-network" providers with CIGNA, the fee schedules from which payment could be calculated were sent by CIGNA.

102. Specifically, when Plaintiffs and those similarly situated Plaintiffs and those similarly situated were classified as "in-network" providers with ASH as CIGNA's third party review mechanism, ASH and CIGNA forced Plaintiffs and those similarly situated to sign the contract with ASH or be removed as an "in-network" provider from CIGNA. This resulted in the application of ASH's fee schedule, a much reduced fee schedule.

103. Plaintiffs and those similarly situated were not made aware of the change at the time the

20

contract was signed, only after.

104.    Using the ASH fee schedule, Plaintiffs and those similarly situated are routinely paid as "out-of-network" providers and "in-network" providers during the same time frames, and sometimes even with the same patients, despite the status of the Plaintiffs and those similarly situated remaining the same during the inconsistent payments.

105.    These inconsistent payments result in billing errors, resubmissions, penalties assessed to the Plaintiffs and those similarly situated, and other damages, including, but not limited to, incomplete payment and untimely payment.

**6.      ASH/CIGNA fail to keep accurate records of claims, records of in-network physicians and out-of-network physicians, including Plaintiffs and those similarly situated.**

106.    Some of the individual Plaintiffs, and others similarly situated, have opted out of the ASH/CIGNA network, but are still shown as "in-network" providers, and are being sent claims processing information as though they are subject to the requirements of ASH contracts.

107.    This directly and proximately results in multiple billing errors, delays, misrepresentations to the patients about the status of their chiropractic physicians, claims processing errors, and errors in payment to Plaintiffs and those similarly situated.

108.    ASH and/or CIGNA have failed to pay claims pursuant to the contracts for the entities that have "opted out" of the ASH third party review system, resulting in improper fees, loss of

21

fees, improper payment of claims, and a complete failure to pay claims.

109. This directly and proximately results in damage to Plaintiffs and those similarly situated, since it is difficult or even impossible to obtain proper payment, less the unilateral fees and penalties assessed against Plaintiffs and those similarly situated.

110. Additionally, the implementation date of ASH's participation replacing the CIGNA contract was changed numerous times.

111. As a result, Plaintiffs and those similarly situated experienced the erroneous denial of multiple claims made prior to ASH's contract effective date with CIGNA. CIGNA also rejected claims that were processed before the effective date of ASH participation.

112. As a direct and proximate result, Plaintiffs and those similarly situated have lost monies earned pursuant to contract with CIGNA.

      **7.**      **ASH is not a third party payment contractor, but a full service claims payment and network review service, resulting in the circumvention by ASH/CIGNA of the process for certification of an insurance company in Tennessee.**

113. CIGNA represented to Plaintiffs and those similarly situated that its contract with providers was still in place, simply suspended during the duration of its contract with ASH as a utilization review company.

114. CIGNA represented to the State of Tennessee Department of Commerce and Insurance, as well as Plaintiffs and those similarly situated, that ASH is simply a tool for benefits review.

22

115. However, CIGNA advises ASH to its participating members as its **vendor partner**.

116. This process results in the total replacement of the chiropractic claims of Plaintiffs and those similarly situated with ASH rates and restrictions, not CIGNA rates and restrictions, with ASH as a third party review company.

117. Upon information and belief, ASH appears to be functioning as an "insurer" similar to CIGNA, not simply a tool, utilizing CIGNA fee schedules and with CIGNA contractual terms with providers.

118. Plaintiffs and those similarly situated chose to contract with CIGNA, but as a result of this unilateral mandatory contract alteration, were forced into ASH's terms, conditions, and fee schedules, despite the patients and benefits being represented as CIGNA.

119. CIGNA represents that "All chiropractic claims will be coordinated and managed by American Specialty Health Network, Inc." Upon information and belief, ASH has not completed the process of insurance registration as an insurance company in Tennessee, yet participates in the payment, processing, claims submission and benefits review in this State.

120. CIGNA uses ASH to lower the rates paid to Plaintiffs and those similarly situated for the benefit of CIGNA and/or ASH, to the detriment of Plaintiffs and those similarly situated.

121. While the patient pays the same copay, Plaintiffs and those similarly situated are now forced to have ASH review the medical necessity of chiropractic services, and ASH refuses to pay those services that are not deemed by an employee of ASH, through medical review, to be "medically necessary."

122. As a direct and proximate result of this action, ASH, not the patient's provider, determines "medical necessity:"

**8.** **Plaintiffs and those similarly situated have had claims "bundled" by ASH and/or CIGNA.**

123. When the claims of Plaintiffs and those similarly situated are reviewed by ASH, Plaintiffs and those similarly situated have experienced bundling of claims.

124. ASH, in its documentation provided to Plaintiffs and those similarly situated, unfairly and inaccurately adjusts the billing on patient visits, grouping multiple dates of treatment and multiple services into a "per diem" in order to deny claims and shift more of the fee to the patient.

125. Upon information and belief, ASH readjusted the billing dates of patient treatment and groups the treatment together in a bundled claim, falsifying the dates of treatment and adjusting the claim separately from the claims submission by Plaintiffs and those similarly situated.

126. As a direct and proximate result of the bundling, the patient becomes responsible for additional copay amounts, and ASH does not pay the amount owed.

127. When the treatment is regrouped by ASH, Plaintiffs and those similarly situated are provided information for multiple services "lumped" together.

128. For example, ASH dictates that a "per diem", or maximum, exists on certain services, such as the number of xrays paid per day. Regardless of how many are performed on a patient,

24

ASH will pay a maximum amount.

129.    By bundling xrays on different dates, xrays that were taken on two separate days are "lumped" together so that the per diem applies, in violation of the contract. Plaintiffs and those similarly situated are then paid a lump sum for the group of visits instead of the correct and accurate amounts for the series of services.

130.    Another example would be where a patient has three consecutive dates of service in a row. The first day, an examination, manipulation, ultrasound and electrical stimulation are billed. ASH pays the allowed amount for the examination, manipulation, and ultrasound, but excludes the stimulation. The total paid by ASH is $58.00, of which the patient pays $45.00 in copay, leaving a balance for ASH to pay of $13.00. For the next two consecutive days, the allowed amount is $36.00, and the patient pays a $45.00 copay. Instead of refunding the difference to the patient for the last two consecutive days, and paying Plaintiffs and those similarly situated $13.00 for the first day, it appears that ASH averages out the payments, choosing to pay $0.00 to the chiropractic physician for all three days of service.

**9.      Patients have been falsely advised by ASH and/or CIGNA that their chosen chiropractic physicians, including some of the individual Plaintiffs, are not qualified to handle their care.**

131.    Patients have been advised in writing, through comments listed on the Explanation of Benefits forms sent to them by CIGNA/ASH, that:

a) the patient's chiropractic physician may not be qualified to treat the patient,

b) the patient should have already been healed, and so this visit is unnecessary, and

c) the visit is denied because of a certain reason.

132.     ASH and/or CIGNA make these determinations, and denials in direct contravention of accepted peer review materials regarding beneficial treatment and care.

133.     ASH and/or CIGNA make these allegations to patients when claims have been denied by ASH, including at times when claims have been improperly denied.

134.     This is not only a false allegation made by ASH and/or CIGNA about Plaintiffs and those similarly situated, but directly interferes with the patient/physician relationship, undermining the trust between patient and physician.

**10.     Post Claim Denial of Benefits**

135.     ASH/CIGNA have engaged in the post claim denial of benefits for chiropractic care.

136.     Specifically, upon information and belief, ASH has preapproved two adjunctive procedures per day,  and denied payment for the procedure performed after care was rendered.

137.     Plaintiffs and those similarly situated were prohibited from recouping the later denied claim monies from the patient.

138.     The misrepresentation by ASH/CIGNA that the claims were approved, when the Plaintiffs and those similarly situated follow the ASH stringent preapproval process, only to have the claims later denied when submitted, is deceptive and disingenuous and

26

results in damage to Plaintiffs and those similarly situated.

## C.  INJURIES OF INDIVIDUAL PLAINTIFFS

139.     The allegations of Paragraphs 1-138 hereinabove are reiterated and incorporated as if fully set forth herein.

140.     Plaintiffs, on behalf of themselves and others similarly situated, were prior in-network providers of chiropractic services with CIGNA, who were forced to accept ASH and CIGNA's unfair terms and conditions, and attempted to remain in-network with CIGNA/ASH, to their detriment, and as a result, suffered injuries.

### (1) PLAINTIFF RICHARD COLE

141.     Richard Cole, a licensed chiropractic physician in the State of Tennessee, had been registered as an in-network provider of benefits for CIGNA patients for several years.

142.     On or about April 1, 2011, he entered into the required ASH three page agreement in order to maintain his in-network status with CIGNA, as required by the multiple letters he had received from CIGNA and ASH.

143.     After signing the short agreement, he received in the mail a CD containing an 82 page contractual agreement with ASH's terms and conditions.

144.     As a direct and proximate result of the actions outlined herein, Dr. Cole has suffered:

    a.     Claims that should have been processed by CIGNA prior to implementation of ASH that were not;

27

b. Claims that have been improperly processed;

c. Delay in payment of claims in violation of the Tennessee statutory maximum;

d. Unreasonable penalties, fees and charges against the claims made;

e. Inconsistent advice from ASH/CIGNA customer representatives, resulting in delay of claims, incorrectly submitted claims;

f. Untruthful statements made about his status as a capable provider made on patient Explanation of Benefits paperwork;

g. Unreasonable and improperly denied claims;

h. the implementation of a discriminatory review process that requires him to submit additional documentation to a third party review process for his medically necessary treatment of patients, when other similarly situated chiropractic physicians are not required to do so;

I. the implementation of a discriminatory review process that requires him to subject his claims to a third party review process for his medically necessary treatment of patients, when other similarly situated medical physicians are not required to do so;

j. improper bundling of claims;

k. inconsistent payments and denials based on erroneous information as to his status as in-network or out-of-network;

28

l.      inconsistent review mechanisms;

m.      misrepresentation of benefits and copay amounts of patients to him, which were then relayed to the patient, ultimately to his detriment;

n.      improper post claims denial;

o.      improper assignment of a Tier program for claims made above the ASH mandated average, resulting in penalties to the provider in violation of law;

p.      improper claims processing requirements for out-of-network providers; and

q.      the determination of medical necessity by a ASH peer reviewer in another state, who has not seen the patient, evaluated the patient, and who is not subject to the standard of care requirements for chiropractic physicians practicing in the State of Tennessee.

145.    As a direct and proximate result of the actions of CIGNA and ASH, Dr. Cole has suffered damages, loss of patients, an interference with the doctor/patient relationship, and monetary damages.

### (2) PLAINTIFF BRADFORD COLE

146.    Bradford Cole, a licensed chiropractic physician in the State of Tennessee, had been registered as an in-network provider of benefits for CIGNA patients for several years.

147.    On or about April 1, 2011, he entered into the required ASH three page agreement in order to maintain his in-network status with CIGNA, as required by the multiple letters

29

he had received from CIGNA and ASH.

148.　　After signing the short agreement, he received in the mail a CD containing an 82 page contractual agreement with ASH's terms and conditions.

149.　　As a direct and proximate result of the actions outlined herein, Dr. Cole has suffered:

a.　　Claims that should have been processed by CIGNA prior to implementation of ASH that were not;

b.　　Claims that have been improperly processed;

c.　　Delay in payment of claims in violation of the Tennessee statutory maximum;

d.　　Unreasonable penalties, fees and charges against the claims made;

e.　　Inconsistent advice from ASH/CIGNA customer representatives, resulting in delay of claims, incorrectly submitted claims;

f.　　Unreasonable and improperly denied claims;

g.　　the implementation of a discriminatory review process that requires him to submit additional documentation to a third party review process for his medically necessary treatment of patients, when other similarly situated chiropractic physicians are not required to do so;

h.　　the implementation of a discriminatory review process that requires him to subject his claims to a third party review process for his medically necessary treatment of patients, when other similarly situated medical physicians are not

30

required to do so;

I.    improper bundling of claims;

j.    inconsistent payments and denials based on erroneous information as to his status as in-network or out-of-network;

k.    inconsistent review mechanisms;

l.    misrepresentation of benefits and copay amounts of patients to him, which were then relayed to the patient, ultimately to his detriment;

m.    improper post claims denial;

n.    improper assignment of a Tier program for claims made above the ASH mandated average, resulting in penalties to the provider in violation of law;

o.    the determination of medical necessity by a ASH peer reviewer in another state, who has not seen the patient, evaluated the patient, and who is not subject to the standard of care requirements for chiropractic physicians practicing in the State of Tennessee; and

p.    improper claims processing requirements for out-of-network providers.

150.    As a direct and proximate result of the actions of CIGNA and ASH, Dr. Cole has suffered damages, loss of patients, an interference with the doctor/patient relationship, and monetary damages.

**(3) PLAINTIFF CARY JUSTICE**

31

151.    Cary Justice, a licensed chiropractic physician in the State of Tennessee, had been registered as an in-network provider of benefits for CIGNA patients for several years, since December 1, 2005.

152.    On or about April 1, 2011, he entered into the required ASH three page agreement in order to maintain his in-network status with CIGNA, as required by the multiple letters he had received from CIGNA and ASH.

153.    After signing the short agreement, he received in the mail a CD containing an 82 page contractual agreement with ASH's terms and conditions.

154.    As a direct and proximate result of the actions outlined herein, Dr. Justice has suffered:

    a.    Claims that should have been processed by CIGNA prior to implementation of ASH that were not;

    b.    Claims that have been improperly processed, including the denial of initial visits;

    c.    Delay in payment of claims in violation of the Tennessee statutory maximum;

    d.    Unreasonable penalties, fees and charges against the claims made;

    e.    Inconsistent advice from ASH/CIGNA customer representatives, resulting in delay of claims, incorrectly submitted claims;

    f.    placement into an arbitrary tier program, and then improper claims processing based on the tier program in which he was placed;

    g.    Unreasonable and improperly denied claims, including the failure to either

32

process or deny claims, prohibiting him from submitting claims to secondary insurance companies;

h.      the implementation of a discriminatory review process that requires him to submit additional documentation to a third party review process for his medically necessary treatment of patients, when other similarly situated chiropractic physicians are not required to do so;

I.      the implementation of a discriminatory review process that requires him to subject his claims to a third party review process for his medically necessary treatment of patients, when other similarly situated medical physicians are not required to do so;

j.      improper bundling of claims;

k.      inconsistent payments and denials based on erroneous information as to his status as in-network or out-of-network;

l.      inconsistent review mechanisms;

m.      misrepresentation of benefits and copay amounts of patients to him, which were then relayed to the patient, ultimately to his detriment;

n.      improper post claims denial;

o.      improper assignment of a Tier program for claims made above the ASH mandated average, resulting in penalties to the provider in violation of law;

p.      the determination of medical necessity by a ASH peer reviewer in another state, who has not seen the patient, evaluated the patient, and who is not subject to the standard of care requirements for chiropractic physicians practicing in the State of Tennessee; and

q.      improper claims processing requirements for out-of-network providers.

155.      As a direct and proximate result of the actions of CIGNA and ASH, Dr. Justice has suffered damages, loss of patients, an interference with the doctor/patient relationship, and monetary damages.

## (4) PLAINTIFF MICHAEL MASSEY

156.      Michael Massey, a licensed chiropractic physician in the State of Tennessee, had been registered as an in-network provider of benefits for CIGNA patients for several years.

157.      On or about May 1, 2011, he entered into the required ASH three page agreement in order to maintain his in-network status with CIGNA, as required by the multiple letters he had received from CIGNA and ASH.

158.      After signing the short agreement, he received in the mail a CD containing an 82 page contractual agreement with ASH's terms and conditions.

159.      As a direct and proximate result of the actions outlined herein, Dr. Massey has suffered:

a.      Claims that should have been processed by CIGNA prior to implementation of ASH that were not;

34

b.      Claims that have been improperly processed, including the denial of initial visits;

c.      Delay in payment of claims in violation of the Tennessee statutory maximum;

d.      Unreasonable penalties, fees and charges against the claims made;

e.      Inconsistent advice from ASH/CIGNA customer representatives, resulting in delay of claims, incorrectly submitted claims;

f.      placement into an arbitrary tier program, and then improper claims processing based on the tier program in which he was placed;

g.      Unreasonable and improperly denied claims, including the failure to either process or deny claims, prohibiting him from submitting claims to secondary insurance companies;

h.      the implementation of a discriminatory review process that requires him to submit additional documentation to a third party review process for his medically necessary treatment of patients, when other similarly situated chiropractic physicians are not required to do so;

I.      the implementation of a discriminatory review process that requires him to subject his claims to a third party review process for his medically necessary treatment of patients, when other similarly situated medical physicians are not required to do so;

j.      improper bundling of claims;

35

k.      inconsistent payments and denials based on erroneous information as to his status as in-network or out-of-network;

l.      inconsistent review mechanisms;

m.      misrepresentation of benefits and copay amounts of patients to him, which were then relayed to the patient, ultimately to his detriment;

n.      improper post claims denial;

o.      improper assignment of a Tier program for claims made above the ASH mandated average, resulting in penalties to the provider in violation of law; and

p.      the determination of medical necessity by a ASH peer reviewer in another state, who has not seen the patient, evaluated the patient, and who is not subject to the standard of care requirements for chiropractic physicians practicing in the State of Tennessee.

160.    As a direct and proximate result of the actions of CIGNA and ASH, Dr. Massey has suffered damages, loss of patients, an interference with the doctor/patient relationship, and monetary damages.

### (5) PLAINTIFF DON WEGENER

161.    Don Wegener, a licensed chiropractic physician in the State of Tennessee, had been registered as an in-network provider of benefits for CIGNA patients for several years.

162.    On or about April 1, 2011, he entered into the required ASH three page agreement in

36

order to maintain his in-network status with CIGNA, as required by the multiple letters he had received from CIGNA and ASH.

163.    After signing the short agreement, he received in the mail a CD containing an 82 page contractual agreement with ASH's terms and conditions.

164.    As a direct and proximate result of the actions outlined herein, Dr. Wegener has suffered:

a.    Claims that should have been processed by CIGNA prior to implementation of ASH that were not;

b.    Claims that have been improperly processed, including the automatic downcoding of visits without modification by him of the claim;

c.    Delay in payment of claims in violation of the Tennessee statutory maximum;

d.    Unreasonable penalties, fees and charges against the claims made;

e.    Inconsistent advice from ASH/CIGNA customer representatives, resulting in delay of claims, incorrectly submitted claims;

f.    Placement into an arbitrary tier program, and then improper claims processing based on the tier program in which he was placed;

g.    Unreasonable and improperly denied claims, including the failure to either process or deny claims, prohibiting him from submitting claims to secondary insurance companies;

h.    the implementation of a discriminatory review process that requires him to

37

submit additional documentation to a third party review process for his medically necessary treatment of patients, when other similarly situated chiropractic physicians are not required to do so;

I.      the implementation of a discriminatory review process that requires him to subject his claims to a third party review process for his medically necessary treatment of patients, when other similarly situated medical physicians are not required to do so;

j.      improper bundling of claims;

k.      inconsistent payments and denials based on erroneous information as to his status as in-network or out-of-network;

l.      inconsistent review mechanisms;

m.      misrepresentation of benefits and copay amounts of patients to him, which were then relayed to the patient, ultimately to his detriment;

n.      improper post claims denial;

o.      improper assignment of a Tier program for claims made above the ASH mandated average, resulting in penalties to the provider in violation of law;

p.      the determination of medical necessity by a ASH peer reviewer in another state, who has not seen the patient, evaluated the patient, and who is not subject to the standard of care requirements for chiropractic physicians practicing in the State

Case 3:14-cv-02022   Document 1   Filed 10/20/14   Page 38 of 62 PageID #: 38

of Tennessee;

q.     the failure by ASH/CIGNA to recognize CPT-standard modifiers to accurately reflect treatment rendered, resulting in failed submitted claims;

r.     the assignment of a Specialty Radiology Quality Assurance Reviewer in order to verify xrays taken by him as a provider, since he exceeded the ASH recommended average, in violation of state law; and

s.     advising by ASH/CIGNA to patients that the patient had completed his or her care, via written documentation on the Explanation of Benefits packages, in direct contradiction with instructions by the provider.

165.   As a direct and proximate result of the actions of CIGNA and ASH, Dr. Wegener has suffered damages, loss of patients, an interference with the doctor/patient relationship, and monetary damages.

## D.  PATTERN OF ACTIVITY - OTHER INDIVIDUALS

166.   The allegations of Paragraphs 1-165 hereinabove are reiterated and incorporated as if fully set forth herein.

167.   Numerous other chiropractic physicians practicing as registered network providers with CIGNA in the State of Tennessee have come forth with accounts of similar business practices, including, inter alia:

a.     CIGNA and/or ASH's discriminatory practices and policies that work to the

39

detriment of Tennessee chiropractic physicians;

b.      coverage and payment errors for claims made;

c.      interference with the doctor/patient relationship with regard to clinical judgment and medical decision making;

d.      unfair and arbitrary terms and conditions unilaterally imposed by ASH in order to maintain network status with CIGNA as in-network providers;

e.      late and improperly paid claims;

f.      unfair and inconsistent application of the Tier system to chiropractic physicians, requiring some physicians to be held to one standard, while others are free from the additional paperwork and reporting requirements;

g.      the imposition of the ASH tier program on out-of-network providers;

h.      the imposition of ASH fee schedules on out-of-network providers;

I.      The imposition of ASH documentation requirements and contractual requirements on out-of-network providers;

j.      Claims that should have been processed by CIGNA prior to implementation of ASH that were not;

k.      Claims that have been improperly processed;

l.      Delay in payment of claims in violation of the Tennessee statutory maximum;

40

m.     Unreasonable penalties, fees and charges against the claims made;

n.     Inconsistent advice from ASH/CIGNA customer representatives, resulting in delay of claims, incorrectly submitted claims;

o.     placement into an arbitrary tier program, and then improper claims processing based on the tier program in which the provider was placed;

p.     Unreasonable and improperly denied claims, including the failure to either process or deny claims, prohibiting providers from submitting claims to secondary insurance companies;

q.     the implementation of a discriminatory review process that requires providers to submit additional documentation to a third party review process for his medically necessary treatment of patients, when other similarly situated chiropractic physicians are not required to do so;

r.     the implementation of a discriminatory review process that requires providers to subject claims to a third party review process for medically necessary treatment of patients, when other similarly situated medical physicians are not required to do so;

s.     improper bundling of claims;

t.     inconsistent payments and denials based on erroneous information as to the providers' status as in-network or out-of-network;

u.      inconsistent review mechanisms;

v.      misrepresentation of benefits and copay amounts of patients to the provider, which were then relayed to the patient, ultimately to the provider's detriment;

w.      improper post claims denial;

x.      improper assignment of a Tier program for claims made above the ASH mandated average, resulting in penalties to the provider in violation of law; and

y.      the determination of medical necessity by a ASH peer reviewer in another state, who has not seen the patient, evaluated the patient, and who is not subject to the standard of care requirements for chiropractic physicians practicing in the State of Tennessee.

168.    All of these providers had previously contracted with one or both of the Defendants, as well as numerous other providers similarly situated, have suffered damages as a result of Defendants' actions.

### III. CLASS ACTION ALLEGATIONS

169.    The allegations of Paragraphs 1-168 hereinabove are reiterated and incorporated as if fully set forth herein.

170.    Plaintiffs bring this action as a class action against Defendants pursuant to Rule 23 of the Federal Rules of Civil Procedure, individually and on behalf of a class, consisting of all persons similarly situated, Tennessee chiropractic physicians, who have been prior in-

network providers with CIGNA, and who were subjected to the unilateral, arbitrary and capricious contract with ASH, in an attempt to maintain In-network status with CIGNA, and as a result, were subjected to in-network requirements of ASH and/or have since been subjected to the actions of ASH and/or CIGNA in attempting to have claims processed through one or both of the Defendant's companies after treatment was rendered to patients covered by CIGNA insurance policies.

171.    The class period commences six years prior to the filing of this Complaint, through the date of the entry of a final judgment.

172.    Plaintiffs are members of the class and will fairly and adequately assert and protect the interests of the class.

173.    The interests of the Plaintiffs are consistent with, and not antagonistic to, those of the other members of the class.

174.    Plaintiffs have retained attorneys who are experienced in class action litigation, and who will provide adequate representation.

175.    Members of the class are so numerous that joinder of all members of the class is impracticable.

176.    Upon information and belief, there exist hundreds of members of the class whose identities can be ascertained from the records and files of Defendants and from other sources.

177.    Common questions of law or fact as to Defendants' breaches of contract,

misrepresentation, negligence, negligence per se, equitable conversion, and unjust enrichment, that have caused and will continue to cause harm to the class predominate over any question affecting only individual members of the class.

178. The prosecution of separate actions by individual members of the class would create a risk of, among other things, the following:

a. Inconsistent or varying adjudications with respect to individual members of the class; and

b. Adjudication with respect to individual members of the class which would, as a practical matter, be dispositive of the interests of other members not parties to the adjudication or substantially impair or impede their ability to protect their interests.

179. The claims of the lead Plaintiffs are typical of the claims of the class, and the class action method is appropriate for the fair and adequate prosecution of this case.

180. Individual litigation of claims which might be commenced by all class members would produce a multiplicity of cases such that the judicial system having jurisdiction of the claims would remain congested for years.

181. Class treatment, by contrast, provides manageable judicial treatment calculated to bring a rapid conclusion to all litigation of all claims arising out of the conduct of Defendants.

182. The certification of a class would allow litigation of claims that, in view of the expense of litigation, may be insufficient in amount to support separate claims.

44

183.    Accordingly, Plaintiffs bring this action on behalf of themselves and on behalf of all other members of the class defined as follows:

All persons similarly situated, Tennessee chiropractic physicians, who have been prior in-network providers with CIGNA, and who were subjected to the unilateral, arbitrary and capricious contract with ASH, in an attempt to maintain In-network status with CIGNA, and as a result, were subjected to requirements of ASH and/or have since been subjected to the actions of ASH and/or CIGNA in attempting to have claims processed through one or both of the Defendant's companies after treatment was rendered to patients covered by CIGNA insurance policies.

184.    Excluded from the class is any judge who may preside over this case.

## IV. CAUSES OF ACTION

## COUNT I - BREACH OF CONTRACT/UNJUST ENRICHMENT

185.    The allegations of Paragraphs 1-184 hereinabove are reiterated and incorporated as if fully set forth herein.

186.    Plaintiffs and class members aver that the representations, assurances and contractual offers made by the Defendants, and the resulting submission of claims to Defendants, and (in some instances) the partial or total failure to perform by Defendants constitute a contract and/or contracts which the Defendants have breached, entitle the Plaintiffs and class members to recover damages for breaches thereof in an amount to be determined by the jury of this cause.

45

187.     Breaches include, but are not limited to, the following:

a.     Failing to properly pay claims as required by contract;

b.     Failing to timely pay claims;

c.     Failing to pay claims pursuant to contractual terms;

d.     The improper assessment of fees and penalties;

e.     The improper application of a "Tier System";

f.     The failure to pay required interest as required by statute for late claims.

188.     The Plaintiffs and class members acted in good faith in their submission of patient claims.

189.     The Defendants failed to act in good faith and fair dealing, by intentionally inducing the Plaintiffs and class members to enter into the ASH contract, while knowing that the contract had not been provided for review by Plaintiffs and class members, and intentionally requiring Plaintiffs and class members to execute the ASH contract in order to maintain In-network provider status with CIGNA.

190.     The Defendants' actions are breaches of contract and continuing breaches, entitling the Plaintiffs and class members to recover damages as may be determined by the jury. The contract with Defendant ASH is a contract of adhesion and is unenforceable due to its terms, conditions, and the manner in which it was represented to Plaintiffs and those similarly situated, who had no knowledge prior to the execution of the three page

46

agreement that an 82 page contract existed and by which they would be bound.

191.    As a result of the false and fraudulent misrepresentations and other wrongful actions of the Defendants, a benefit was conferred upon the Defendants by the Plaintiffs and class members, which benefit was accepted by the Defendants under such circumstances that it is inequitable for the Defendants to retain the benefit without payment of the fair value thereof.

192.    If the fact finder determines that there is no enforceable contract between the parties, or that a contract has become unenforceable and invalid, or that the contract was unfairly administered as a contract of adhesion, Plaintiffs and class members aver that, in the alternative, Defendants, and each of them, were unjustly enriched and/or there exists a quasi-contract under which the Plaintiffs and class members may recover the value of the unjust enrichment received by the Defendants.

## COUNT II - CONTRACT OF ADHESION

193.    The allegations of Paragraphs 1-192 hereinabove are reiterated and incorporated as if fully set forth herein.

194.    Plaintiffs and class members aver that the contracts that were suspended resulted in the signing of adhesive contractual agreements executed by and between Plaintiffs and class members and Defendants, and the resulting forced submission of claims to Defendants, and (in some instances) the partial or total failure to perform by Defendants, which constitutes a contract and/or contracts which the Defendants have breached, entitle the

47

Plaintiffs and class members to an order from this Court as to the specific performance of the original contract between CIGNA and Plaintiffs and class members.

195.     Breaches include, but are not limited to, the following:

    a.     The unilateral suspension by CIGNA of the contract with providers;

    b.     the forced submission of claims by ASH;

    c.     Failing to properly pay claims as required by contract;

    d.     Failing to timely pay claims;

    e.     Failing to pay claims pursuant to contractual terms;

    f.     The improper assessment of fees and penalties;

    g.     The improper application of a "Tier System";

    h.     The failure to pay required interest as required by statute for late claims.

196.     The Plaintiffs and class members were not provided with an opportunity to negotiate and the terms of the contract were forced upon them by the unilateral "suspension" of CIGNA.

197.     The Defendants failed to act in good faith and fair dealing, by intentionally inducing the Plaintiffs and class members to enter into the ASH contract, while knowing that the contract had not been provided for review by Plaintiffs and class members, and intentionally requiring Plaintiffs and class members to execute the ASH contract in order

48

to maintain In-network provider status with CIGNA.

198.     The Defendants' actions are breaches of contract and continuing breaches, entitling the Plaintiffs and class members to seek specific performance and/or recover damages as may be determined by the jury.

199.     The contract with Defendant ASH is a contract of adhesion and is unenforceable due to its terms, conditions, and the manner in which it was represented to Plaintiffs and those similarly situated, who had no knowledge prior to the execution of the three page agreement that an 82 page contract existed and by which they would be bound.

200.     As a result of the false and fraudulent misrepresentations and other wrongful actions of the Defendants, a benefit was conferred upon the Defendants by the Plaintiffs and class members, which benefit was accepted by the Defendants under such circumstances that it is inequitable for the Defendants to retain the benefit without payment of the fair value thereof.

201.     If the fact finder determines that there is no enforceable contract between the parties, or that a contract has become unenforceable and invalid, or that the contract was unfairly administered as a contract of adhesion, Plaintiffs and class members demand specific performance of the initial contract negotiated with CIGNA.

## COUNT III - FRAUD/TORTIOUS MISREPRESENTATION

202.     The allegations of Paragraphs 1-201 hereinabove are reiterated and incorporated as if fully set forth herein.

203.     The statements, representations, and activities of Defendants, and as carried out by the Defendants, individually, and acting in concert with and through each other and/or their agents and the companies listed as Defendants herein, were part of a scheme to defraud, intended to defraud and in fact, did defraud the Plaintiffs, class members, and identified persons herein, by causing the Plaintiffs and class members to rely upon the misrepresentations to their detriment.

204.     At the time that the three page ASH "contracts" were executed by Plaintiffs and class members, the Defendants, and each of them, either directly or by imputation, knew that the representations that this was the entire ASH agreement, when made, were false, were being relied upon by Plaintiffs and the members of the class to their detriment, and were intended to mislead and result in an unfair advantage to Defendants.

205.     Specifically, the Defendants made those misrepresentations set forth hereinabove, and the following misrepresentations, among others:

    a.     That, the contract with CIGNA would continue;

    b.     That the three page agreement and ASH enrollment package constituted the entire agreement;

    c.     That the fee schedules for CIGNA were to remain in place.

206.     In reliance upon false representations made, the Plaintiffs and class members relied on and were misled to their detriment:

    a.     To Execute the ASH Election to Participate in CIGNA;

      b.      To submit to the ASH requirements, certifications, paperwork submissions, and claims processing requirements.

207.     Defendants knew, and intended that Plaintiffs and class members would rely on their false representations, and that Plaintiffs and class members would be induced to send the executed three page agreements, which Defendants knew was not the complete contract.

208.     As a direct and proximate result of Defendants' intentional acts, and each of them, acting in concert with each other and with others, Plaintiffs suffered financial and other damages for which Plaintiffs and class members are entitled to recover significant damages in an amount to be determined by the jury.

209.     The actions of the Defendants, and each of them, jointly and severally, and acting in concert with each other, and with others not yet identified, i.e., John Does A, B, and C and Jane Does A, B, and C were intentional, and calculated to deceive and, as a result thereof, the Plaintiffs and class members are entitled to recover punitive damages in an amount to be set by the jury.

## COUNT IV - WRONGFUL TROVER AND CONVERSION

210.     The allegations of Paragraphs 1-209 hereinabove are reiterated and incorporated as if fully set forth herein.

211.     The actions of the Defendants and each of them, jointly and severally, and acting in concert with one another, amount to a wrongful conversion of the properties and assets of the Plaintiffs and class members.

51

212.   Defendants converted to their own use monies for claims rightfully belonging to Plaintiff and class members, intentionally and deliberately withheld the earned monies rightfully belonging to Plaintiffs and class members, thus converting the money to Defendants' own use.

213.   Plaintiffs and class members retained equitable and/or legal title to all assets owned by Plaintiffs and class members as a result of the Defendants' misrepresentations and agreements.

214.   As a direct and proximate cause of the Defendants' wrongful conversion of the Plaintiffs' and class members' properties and assets, individually and acting in concert with one another, the Plaintiffs and class members suffered damages, for which the Plaintiffs and class members are entitled to recover in an amount to be established by the jury.

215.   The actions of the Defendants and each of them, jointly and severally, and acting in concert with each other, were intentional, and calculated to deceive, and as a result thereof, Plaintiffs and class members are entitled to recover punitive damages in an amount to be set by the jury.

## COUNT V - CONSTRUCTIVE TRUST

216.   The allegations of paragraphs 1-215 hereinabove are reiterated and incorporated as if fully set forth herein.

217.   Defendants obtained money from Plaintiffs and the class members through a scheme of

fraud, concealment, misrepresentation and unfair dealing.

218. Plaintiffs and the class members submitted claims for payment to Defendants in good faith due to the requirements of Defendants, which unlawfully deceived Plaintiffs and the class members and defrauded them of their money.

219. It would be unfair, inequitable and unconscionable for Defendants to retain and enjoy the benefits of the monies Defendants obtained from Plaintiffs and the class members.

220. The imposition of a constructive trust is necessary and proper to preserve the status quo and will ensure that Defendants do not otherwise acquire, transfer, encumber, squander, secrete, or dispose of Plaintiffs' and the class members' money, or any interests or profits derived from Plaintiffs' and the class members' money without the prior approval of Plaintiffs and the class members and this Court.

221. A constructive trust should be imposed over all money Defendants obtained from Plaintiffs and the class members, as well as over all interest or profits Defendants have obtained from those monies.

222. The imposition of a constructive trust is necessary and proper and in the interest of justice to do equity and to prevent unjust enrichment.

## COUNT VI - NEGLIGENCE

223. The allegations of paragraphs 1-222 hereinabove are reiterated and incorporated as if fully set forth herein.

53

224.     CIGNA and/or ASH owed a duty to Plaintiffs and those similarly situated to comply with the terms of the contract of adhesion forced upon Plaintiffs and those similarly situated, and to comply with Tennessee law.

225.     CIGNA and/or ASH breached its duty to Plaintiffs when CIGNA and/or ASH:

a.     failed to comply with the terms forced upon Plaintiffs, in the time frame and deadlines unilaterally imposed on Plaintiffs by Defendants;

b.     negligently gave erroneous advice to providers, then penalized them for incorrect claims;

c.     negligently failed to timely pay claims;

d.     negligently failed to comply with state law;

e.     negligently failed to refer claims to the proper entity for claims processing;

f.     negligently failed to pay statutory interest for late payments;

g.     negligently failed to train its employees, staff, and agents to properly process claims, answer claims processing questions, and educate providers;

h.     failed to pay Plaintiffs and others similarly situated as required by law;

I.     failed to avoid discriminatory practices with regard to Plaintiffs and those similarly situated;

j.     failed to correct the above-stated errors after notice by Plaintiffs and class

members;

k.      post claim denial of benefits;

m.      failing to maintain network adequacy;

n.      failing to accurately report providers that are in-network and out-of-network so as to prevent erroneous billing; and

o.      other acts of negligence.

226.    As a result of Defendants' common law negligence, Plaintiffs and those similarly situated were  directly and proximately caused to suffer damage, entitling Plaintiffs to recover damages in such amount as deemed reasonable by a jury.

## COUNT VII - NEGLIGENCE PER SE

227.    The allegations of paragraphs 1-228 hereinabove are reiterated and incorporated as if fully set forth herein.

228.    Defendants also violated state law, including:

A.      Tenn. Code Ann. 56-7-2404, which states:

**§ 56-7-2404. Chiropractor services**

(a)(1) Whenever any policy of insurance issued in this state provides for reimbursement for any service that is within the lawful scope of practice of a duly licensed chiropractor, the insured or other person entitled to benefits under the policy shall be entitled to reimbursement for the services, whether the services are performed by a duly licensed medical physician or by a duly licensed chiropractor, notwithstanding any provision contained in the policy.

55

(2) Whenever any insurance subscribers under any sickness and accident, medical service plan, hospital service contract or hospital and medical service contract, as provided under chapters 26-29 of this title or any similar statutes, or any other persons covered by the plan or contract, are entitled to reimbursement for any services that are within the lawful scope of practice of a duly licensed chiropractor, the subscriber or other person shall be entitled to reimbursement for the services, whether the services are performed by a duly licensed medical physician or a duly licensed chiropractor, notwithstanding any provision to the contrary in any other statute or in the plan or contract; and duly licensed chiropractors shall be entitled to participate in the plans or contracts providing for the services to the same extent and subject to the same limitations as duly licensed medical physicians.

(b) This section shall not be construed as enlarging the scope of practice of chiropractic or the requiring of any insurance policy, medical service plan, hospital service contract or hospital and medical service contract to provide for spinal, neurological or musculoskeletal care.

(c) This section shall apply to all policies or plans issued or renewed on and after July 1, 1981.

B.      Tenn. Code Ann. 56-32-129(a), which states:

### § 56-32-129. Scope of services

(a) The managed health insurance issuer shall not discriminate with respect to participation, referral, reimbursement of covered services or indemnification as to any provider within a class of providers who is acting within the scope of the provider's license or certification under state law, solely on the basis of license or certification. In selecting among providers of health services for membership in a provider network, the managed health insurance issuer or other network shall not discriminate against a class of providers who provide services that are covered by the plan by prohibiting the class of providers from membership in the provider network. This section shall not be construed as prohibiting managed health insurance issuers from including providers or classes of providers only to the extent necessary to meet the needs of the managed health insurance issuer's plan and its enrollees, or from limiting referrals or establishing any other measure designed to maintain quality and control costs consistent with the responsibilities of the plan. This chapter shall not be construed as creating coverage for any service that is not otherwise covered under the terms of the managed health insurance issuer's plan.

C.      Tenn. Code Ann. 56-7-109(b), which states:

**§ 56-7-109. Health insurance claims; timely reimbursement**

(b) PROMPT PAYMENT STANDARDS.

(l)(A) Not later than thirty (30) calendar days after the date that a health insurance entity actually receives a claim submitted on paper from a provider, a health insurance entity shall:

(i) If the claim is clean, pay the total covered amount of the claim;

(ii) Pay the portion of the claim that is clean and not in dispute and notify the provider in writing why the remaining portion of the claim will not be paid; or

(iii) Notify the provider in writing of all reasons why the claim is not clean and will not be paid and what substantiating documentation and information is required to adjudicate the claim as clean.

(B) Not later than twenty-one (21) calendar days after receiving a claim by electronic submission, a health insurance entity shall:

(i) If the claim is clean, pay the total covered amount of the claim;

(ii) Pay the portion of the claim that is clean and not in dispute and notify the provider why the remaining portion of the claim will not be paid; or

(iii) Notify the provider of the reason why the claim is not clean and will not be paid and what substantiating documentation or information is required to adjudicate the claim.

(2) No paper claim may be denied upon resubmission for lack of substantiating documentation or information that has been previously provided by the health care provider.

(3) Health insurance entities shall timely provide contracted providers with all necessary information to properly submit a claim.

(4) Any health insurance entity that does not comply with subdivision (b)(1) shall pay one percent (1 %) interest per month, accruing from the day payment was due, on that amount of the claim that remains unpaid.

229.     Plaintiffs and those similarly situated fall within the class of persons protected by the laws of the State of Tennessee.

230.     As a direct and proximate result of Defendants' negligence per se, Plaintiffs and those

57

similarly situated were directly and proximately caused to suffer damage, entitling Plaintiffs to recover damages in such amount as deemed reasonable by a jury.

## COUNT VIII - ACCOUNTING

231.    The allegations of paragraphs 1-230 hereinabove are reiterated and incorporated as if fully set forth herein.

232.    Based on the actions and inactions of Defendants including, without limitations, the actions identified in this Complaint, the monies entrusted by Plaintiffs and the class members to Defendants were not used for the purposes for which they were entrusted and have been diverted, and misused by Defendants.

233.    Plaintiffs and class members, therefore, seek and are entitled to a full and complete accounting from Defendants of all the monies that were earned by Plaintiffs and the class members that are in the possession of Defendants and all other assets that were and/or are in the possession, custody and/or control of Defendants that rightfully belong to Plaintiffs.

234.    Plaintiffs and class members reserve the right to amend this complaint and *ad damnums* contained herein and additional facts become known.

## PRAYER FOR RELIEF

Premises considered, the Plaintiffs and members of the class pray:

A.  That the Defendants be required to answer the Complaint filed herein, upon their oath;

58

B. The court set a hearing for the declaration of a resulting trust and/or constructive trust as listed in Count V in this cause and enjoin the Defendants from further disposing of and/or liquidating any properties owned by Plaintiffs and/or class members. THIS IS THE FIRST REQUEST FOR INJUNCTIVE RELIEF. Alternatively, that the Court declare a trust on all other monies paid to Defendants by Plaintiffs and class members and converted by Defendants, the same to be held in trust for the benefit of the Plaintiffs and class members and that the Defendants be required to account for all such monies, assets, said properties and their management of them, and that the Plaintiffs and class members recover all damages suffered by them as a result of the misuse, waste, conversion and/or destruction of the present monies in an amount not to exceed Ten Million Dollars ($10,000,000);

C. That the Court order that the Defendants, and each of them, as listed in Count VIII, provide a full accounting of all properties, assets, monies, accounts, and activities of the ongoing businesses and of all funds obtained or taken by them as a result of their actions against the Plaintiffs and members of the class, and;

D. That, pursuant to Count I of the Complaint, Breach of Contract/Unjust Enrichment, that the Plaintiffs and class members recover damages to be determined by the jury in an amount not to exceed Ten Million Dollars ($10,000,000), or in the alternative, the value of the true unjust enrichment;

E. That the Court order, pursuant to Count II of the Complaint, Contract of Adhesion, that the adhesive contract of ASH be set aside and the original contract reinstated; or alternatively, the Plaintiffs and class members recover damages to be determined by the jury in an amount

59

not to exceed Ten Million Dollars ($10,000,000);

F.  That, pursuant to Count III, Fraud/Tortious Misrepresentation, that the Plaintiffs and class members recover damages to be determined by the jury in an amount not to exceed Ten Million Dollars ($10,000,000), along with punitive damages in an amount not to exceed Ten Million Dollars ($10,000,000).

G.  That, pursuant to Count IV of the Complaint, Wrongful Trover/Conversion, the Court declare that the Defendants hold the assets of the Plaintiffs and class members obtained by them as a result of the fraudulent schemes, that the fraudulent schemes depicted herein were not a just and proper usage of the monies obtained from Plaintiffs and class members, and, as a result, such indebtedness owed by the Defendants to the Plaintiffs and class members be transferred to the Plaintiffs;

G.  That, pursuant to Count VI of the Complaint, Negligence, that the Plaintiffs and class members recover damages to be determined by the jury in an amount not to exceed Ten Million Dollars ($10,000,000);

H. That, pursuant to Count VII of the Complaint, Negligence Per Se, that the Plaintiffs and class members recover damages to be determined by the jury in an amount not to exceed Ten Million Dollars ($10,000,000);

I.  Plaintiffs and class members demand a jury to try the issues when joined.

J.  Plaintiffs and class members reserve the right to amend this complaint, *ad damnums,* and the facts contained herein as more information becomes available.

WHEREFORE, Plaintiffs and the class request judgment in their favor against Defendants in an amount to be determined, plus costs, interest, and attorneys fees, punitive damages, declaratory and injunctive relief, and any other relief to which Plaintiffs and the class is entitled.

**THIS IS THE FIRST APPLICATION FOR INJUNCTIVE RELIEF.**

RESPECTFULLY SUBMITTED this 16th day of October, 2014.

LAW OFFICE OF J. HOUSTON GORDON

BY:  /s/ J. Houston Gordon
      J. HOUSTON GORDON, TN #7523
      LYLE REID, TN#07779
      AMBER GRIFFIN SHAW, TN #026337
      Suite 300, Hotel Lindo Building
      114 West Liberty Avenue
      P. O. Box 846
      Covington, TN 38019-0846
      (901) 476-7100/Telephone
      (901) 476-3537/Facsimile
      lawjhg@comcast.net

BONE McALESTER NORTON, PLLC

By:  /s/ Charles Robert Bone
      CHARLES ROBERT BONE TN #021161
      511 Union Street
      Suite 1600
      Nashville, TN 37219
      (615) 238-6394/Telephone
      (615) 687-5597/Facsimile
      crb@bonelaw.com

*Attorneys for Plaintiffs and class members*

61

62